| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| In Re:<br>Crest By The Sea, LLC,<br>               Debtor. | Order Filed on December 23, 2014<br>by Clerk<br>U.S. Bankruptcy Court<br>District of New Jersey |

Case No.: 14-31681-ABA
Chapter: 7
Judge: Andrew B. Altenburg, Jr.

## MEMORANDUM DECISION

**DATED: December 23, 2014**

Honorable Andrew B. Altenburg, Jr.
United States Bankruptcy Court

### I.    Procedural Background

This matter is before the court on two motions. First, the Motion of the Debtor Crest By The Sea, LLC (the "Debtor") to Enforce the Automatic Stay as to the Debtor's Individual Members (the "Motion to Enforce"), see Doc. No. 3 on the Court's Docket by and through its counsel, John R. Crayton, Esq., with opposition having been filed against the Motion to Enforce by Crest by the Sea Condominium Association, Inc. and numerous unit owners (collectively, the "Association"), by and through its counsel, Anne-Marie P. Kelley, Esquire and James H. Landgraf, Esquire of Dilworth Paxson LLP, see Doc. No. 19 on the Court's Docket. Second, there is the Motion by the Association for an Order Dismissing Case for Filing the Petition without Authority and/or in Bad Faith or, Alternatively, Granting Relief from the Automatic Stay and Waiving the 14-Day Stay of Effectiveness of Order (the "Motion to Dismiss"). See Doc. No. 16 on the Court's Docket. The Debtor opposed the Motion to Dismiss. See Doc. No. 29 on the Court's Docket. An initial hearing was held on November 25, 2014 at which time the court requested further submissions and scheduled the matter for a plenary hearing on December 4, 2014. On that date, the court took argument and testimony.[1] Three of the individual members of the Debtor - William Lublin, James Walsh and Joseph Bada, Jr. (each a "Member") - are represented by and through their separate counsel, Mara Cohen Jackel, Esquire and David F. Michelman of Michelman & Bricker, P.C. Member William Lublin and Member Joseph Ciminera testified on behalf of the Debtor.[2]

The following constitutes the court's findings of facts and conclusions of law.

### II.    Findings of Fact

#### The Debtor

The Debtor is a Limited Liability Company that designed, developed, built and sold a residential community development consisting of ten condominium units and certain common elements contained in a single story building located at 408 E. Farragut Road, Wildwood Crest, New Jersey known as "Crest by the Sea."

The Debtor was incorporated under the laws of the State of New Jersey on March 26, 2004. As part of its incorporation process, the Debtor created an Operating Agreement (the "Operating Agreement") which governs its activities. See Doc. No 20 on the Court's Docket (the "Operating Agreement"). At the time of its incorporation the Debtor had five members, the four previously named Members and Michael Callahan. Id., at page 2. The Percentage Interests in the Debtor were as follows: Michael T. Callahan – 33.33%; Joseph J. Ciminera – 16.67%; Joseph F. Bada, Jr. – original interest 16.66%; James Walsh – 16.67%; and William H. Lublin – 16.67%. (collectively, the "Percentages"). Id., at Section 7.1.

---

[1] The parties also submitted addition pleadings in support of their positions which were considered by the court at the December 4 hearing.

[2] A fourth Member of the Debtor, Joseph Ciminera (together with Lublin, Walsh and Bada the "Members"), is not represented by Michelman & Bricker, P.C.

The Debtor is a manager-managed limited liability company. Member Lublin and Member Walsh were named co-managers to act as the "Manager" of the Debtor. *Id.*, at Section 4.1. Member Callahan filed for bankruptcy in November of 2010.[3] The Debtor ceased its operations and has had no income since 2010.

### The State Court Actions

The Debtor and its Members are currently defendants in a lawsuit filed by the Association in 2010 in the Superior Court of New Jersey—Cape May County related to alleged acts and omissions committed in connection with a condominium construction project captioned *Crest by the Sea Condo. Assoc., et al. v. Crest by the Sea, LLC et al.*, Docket No. 10-491 (the "State Court Action"). The Association alleged against the Debtor and the Members, *inter alia*, breaches of fiduciary duty and expressed and implied contractual responsibilities; common law and statutory fraud; and piercing the respective corporate veil. The Debtor and its Members have denied the allegations. Discovery in the State Court Action is complete. A hearing on a series of motions *in limine* was to be held on October 31, 2014. The State Court Action was scheduled for a trial beginning December 1, 2014 and expected to run for several weeks.

The Debtor and its Members are also currently defendants in second lawsuit which was filed in May 2014 in the Superior Court of New Jersey—Cape May County captioned *Evanston Ins. Co. v. Crest by the Sea Condo Assoc., et al.*, Docket No. 14-211 (the "Declaratory Judgment Action"). This second lawsuit is an insurance declaratory judgment action related to potential insurance coverage through one of its insurers and indemnification by that insurer for the Debtor and its Members in the State Court Action.

Member Lublin and Member Walsh have been personally funding both litigations. There are no promissory notes between the Debtor and Member Lublin and Member Walsh for their funding of the litigations.

### The Bankruptcy Case

On October 23, 2014, Member Lublin and Member Walsh, as Manager of the Debtor, met in person and voted in favor of filing for bankruptcy protection. Member Walsh contacted Member Bada by telephone that same day and secured his vote authorizing the filing. Both Member Walsh and Member Bada attempted to contact Member Ciminera that same day but he could not be reached. Member Callahan was not contacted.

On October 24, 2014, the Debtor filed its complete chapter 7 bankruptcy Petition, Schedules and Statement of Financial Affairs "(SOFA") (collectively, the "Petition"). The Corporate Resolution filed with the Petition, Doc. No. 2 on the Court's Docket, states that a majority of members authorized the bankruptcy filing. Shortly after the Petition was filed, Member Ciminera contacted the Debtor's attorney and left him a voice message consenting to the bankruptcy filing. Member Ciminera testified and confirmed that he ratified the Debtor's decision to file the Petition.

---

[3] *See Bankr. Case No. 10-44610-GMB.*

The Petition reflects that it was signed by Member Walsh on behalf of the Debtor. The Petition was signed by Member Walsh as true and correct under penalty of perjury. The Petition is not dated anywhere. The Petition lists as its only assets a condominium unit of little, if any value at all[4] and a bank account of $629.82. TD Bank, N.A. and Wildwood Crest Borough are listed as secured creditors against the condominium unit. The only other creditors listed are the plaintiffs and co-defendants in the State Court Action. All are listed with a claim of $0.00. The Petition reveals that the Debtor has no income or expenses.

The SOFA provides at Question No. 9 that bankruptcy counsel was retained and paid in June 2014. Question No. 1 also confirms that the Debtor has had no income in 2012, 2013 and 2014. Question 21 provides that Member Walsh and Member Lublin each own 50% of the membership interests in the Debtor.[5]

On the date of the Petition, the Debtor filed the Motion to Enforce. No Member provided a certification in support of the Motion to Enforce. Based on the Debtor's bankruptcy case and the pending Motion to Enforce, the State Court Action was stayed by the trial judge pending a ruling from the bankruptcy court regarding the applicability of the Debtor's automatic stay to the non-debtor Defendants.

On October 28, 2014, the Debtor filed an Amended Petition to reflect the proper Employer Identification Number.

On November 3, 2014, the Debtor filed an Amendment to Schedules D and F adding the Association as a secured creditor for an unpaid condominium lien and counsel to the Association on behalf of its client. This amendment was signed by Member Walsh as correct under penalty of perjury.

On November 6, 2014, the Debtor filed an Amendment to Schedule B adding as estate property the unliquidated insurance policy at issue in the Declaratory Judgment Action as well as potential insurance and/or indemnification coverage under three other policies against which it has filed insurance claims. The Debtor believes recovery under the four separate policies will create substantial assets for the bankruptcy estate. The Debtor also listed unliquidated counterclaims and cross-claims against various parties. This amendment was signed by Member Walsh as true and correct under penalty of perjury.

On November 12, 2014, the Debtor filed an amended SOFA referencing the Debtor's termination of its relationship with Member Callahan, Member Ciminera and Member Bada within the year before the bankruptcy filing. That amendment listed the Percentages of the

---

[4] The Debtor assigns a value of $0.00 to the condominium unit.

[5] This does not compare with the Percentages set forth in the Operating Agreement.

apparently disassociated Members.[6] This amendment was signed by Member Walsh as true and correct under penalty of perjury.

### III. Conclusions of Law

The Court will first consider the Motion to Dismiss.

#### A. Authority to File the Petition

The Association alleges that the Debtor's bankruptcy filing was unauthorized.[7] According to the Association, since only 3 of the original members of the Debtor - Member Lublin, Member Walsh and Member Bada - authorized the bankruptcy filing, the filing was not authorized under New Jersey's Revised Uniform Limited Liability Company Act, N.J.S.A. 2:2C-1, *et seq.* (West 2012) ("RULLCA"). Although any matter relating to the activities of a manager-managed limited liability company is generally decided exclusively by the manager under the RULLCA, the Association argues that the consent of all members is required to, *inter alia*, "undertake any other act outside the ordinary course of the company's activities." N.J.S.A. § 42:2C-37(c)(4)(C).

It is well settled that the filing of a bankruptcy petition is outside the course of a limited liability company's activities. *See Avalon Hotel Partners*, 302 B.R. 377, 380-81 (Bankr. D. Or. 2003); *In re DeLuca*, 194 B.R. 79, 87 (Bankr. E.D. Va. 1996). The issue becomes whether RULLCA, which governs New Jersey LLCs when their operating agreements are silent, and which was in effect at the time the Debtor filed for bankruptcy, N.J.S.A. at § 42:2C-1, or the Debtor's Operating Agreement dictates the vote required to authorize the Debtor's bankruptcy.

First, the court must address the issue of Member Callahan. Under the original New Jersey Limited Liability Company Act, which was in effect in November of 2010 when Callahan filed for bankruptcy, a member of an LLC was automatically dissociated from that LLC upon the filing of a bankruptcy petition. N.J.S.A. § 42:2b-24a.(3)(a) (2010). Therefore, on the date Callahan filed for bankruptcy he was automatically dissociated from the Debtor.[8] Based on

---

[6] Counsel to the Debtor later stated that he misinterpreted the Debtor's tax returns to reflect that the Members became disassociated with the Debtor. Counsel to the Debtor claimed that this was an error on his part and that the Percentages should be reflected to show an equal percentage between associated Members.

[7] Both the Debtor and the Association raised arguments regarding the authorization of the filing at the December 4 hearing that were not raised in the pleadings filed with the court. Those additional arguments were considered in preparing this decision.

[8] To the extent the Association argues that Callahan's presence on the Debtor's K-1s after his bankruptcy suggests that Callahan was still a Member of the Debtor, we note the following: in New Jersey, a dissociated member of an LLC "is enjoined from participating in the management of the LLC" but "retains [his] economic rights" since dissociation does not "automatically constitute[] a loss of economic rights in addition to a loss of managerial rights." *All Saints University of Medicine Aruba v. Chilana*, No. C-147-08, 2012 WL 6652510, at *13 (N.J. Super. Ct. Ch. Div. Dec. 24, 2012). In addition to the case law, RULLCA provides that a dissociated member can no longer participate in the "management and conduct of the company's activities" even though he can retain any "transferable interest" he owned prior to his dissociation "solely" in the capacity of "transferee." N.J.S.A. § 42:2C-47. In light of this statutory and case law, although Callahan was indisputably dissociated from the Debtor the moment he filed for bankruptcy and was thus prohibited from participating in the management and conduct of the company's activities,

Callahan's dissociation with the Debtor, the court has determined that as of the date of its bankruptcy filing, the Debtor had four Members - William Lublin, James Walsh, Joseph Bada, Jr. and Joseph Ciminera.

The RULLCA requires a unanimous vote of the members of an LLC to undertake actions outside of the ordinary course. N.J.S.A. § 42:2C-37(c)(1)-(4). The Operating Agreement, on the other hand, does not explicitly set forth a procedure for voting on actions outside of the ordinary course. The Operating Agreement clearly provides that "[e]xcept as otherwise provided in this Agreement, the Manager shall be responsible for the operation of the LLC's business in the ordinary course." Operating Agreement at Section 4.1. In addition, the Operating Agreement provides for a vote of the Members in a handful of unique circumstances. For example, in Section 5.2, the Operating Agreement requires a vote of the majority of the Members with an interest in the profits for certain actions including actions to "dissolve or wind up the LLC." *Id.* at Section 5.2. While Section 5.2 does not specifically pertain to bankruptcies, the "dissolve or wind up" language of Section 5.2 mirrors the definition of "Bankruptcy" provided the Operating Agreement, which includes when "the winding-up or liquidation of [a] person's affairs shall have been ordered" upon "such person [having] applied for or consented to such decree." *Id.* at Section 1.5. The Operating Agreement defines a "person" to include a limited liability company. *Id.* at Section 1.22. With this analysis in mind, this court finds that Section 5.2 of the Debtor's Operating Agreement contemplates the bankruptcy of the Debtor as an event that would require the consent of the majority of the Debtor's Members.[9]

Regardless of whether the RULLCA applied and the Debtor required a unanimous vote of the Members to file for bankruptcy or, in the alternative, Section 5.2 of the Debtor's Operating Agreement controlled and the Debtor required a majority vote of the Members to file for bankruptcy, the court finds that the Debtor secured enough votes to authorize its bankruptcy filing under either scenario. As set forth above, at the time the Debtor filed for bankruptcy, it had four Members. Of these four Members, three (Lublin, Walsh and Bada) unquestionably authorized the bankruptcy prior to its filing. The Debtor thus met the authorization standard contained in its Operating Agreement as a majority of its Members consented to the bankruptcy filing.

To the extent that RULLCA applied and the Debtor required a unanimous vote of its Members to file for bankruptcy, Member Ciminera's October 23rd voicemail and subsequent testimony at the December 4 hearing constitutes a ratification that secures a unanimous vote of the Members in favor of the bankruptcy. *See Kay v. Federal Rubber Co.*, 46 F.2d 64, 65 (3d Cir. 1930) (applying the doctrine of ratification in the context of a bankruptcy); *In re ORFA Corp. of America (Del.)*, 115 B.R. 799, 805 (Bankr. E.D. Pa. 1990) ("There is also little doubt that directors of a corporation can validate previous unauthorized actions of a board or purported board of directors by ratification under the law of Delaware . . . as well as under the pertinent law

---

it is possible he retained or retains an economic interest in the Debtor which was reflected on the Debtor's K-1s post-bankruptcy.

[9] Similarly, Section 10.1 provides that the LLC may be "terminate[d] and dissolve[d]" with the written approval of the Manager and a majority vote of those Members with an interest in the profits. *Id.* at Section 10.1. This language mirrors the "dissolve" language included in the definition of "Bankruptcy" in Section 1.5 of the Operating Agreement. *Id.* at Section 1.5.

applicable in all American jurisdiction."); *In re Be-Fit Health & Racquet, Inc.*, No. 97-31273F, 1997 WL 34726325, at *2 (Bankr. E.D. Pa. Nov. 4, 1997) (allowing a retroactive corporate resolution to ratify a bankruptcy filing); *In re I.D. Craig Service Corp.*, 118 B.R. 335 (Bankr. W.D. Pa. 1990) (stating that "a Board of Directors may ratify the acts of a corporate officer after the fact" and finding that board members ratified a bankruptcy filing by participating in the bankruptcy proceedings); *In re Penny Saver, Inc.*, 15 B.R. 252, 253 (Bankr. E.D. Pa. 1981) ("It has long been held that the president of a corporation cannot, without authority or ratification of the board of directors, institute voluntary bankruptcy proceedings against his corporation.").

It is apparent to the court that the Debtor was authorized to file for bankruptcy regardless of whether a unanimous or majority vote was required.

### B. Motion to Dismiss/Relief from Stay

Now that the court has determined that the bankruptcy filing was properly authorized, we turn to the Association's allegation that the case was filed in bad faith.

Section 707(a) of the Bankruptcy Code permits this court to dismiss a Chapter 7 case "for cause." 11 U.S.C. § 707(a) (2010). The Third Circuit has acknowledged that bad faith can be an appropriate ground for dismissing a case. *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000). The decision to dismiss a Chapter 7 case "for lack of good faith rests within the sound discretion of the bankruptcy court," *id.* (citing *Zick*, 931 F.2d at 1129), and the bankruptcy court can consider such factors such as whether "the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." *Id.* (citing *In re Marks*, 174 B.R. 37, 40 (E.D. Pa. 1994)). "Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *Id.* (citing *In re Marks*, 174 B.R. at 40). The Third Circuit has also stated that "Bankruptcy Courts may reasonably find that bad faith exists 'where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose.'" *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (citing *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994); *see also In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994) (finding that a chapter 7 bankruptcy case was filed in bad faith and was properly dismissed for cause where the debtor's purpose was to frustrate another court's jurisdiction). This case, the Association alleges that the Debtor filed its bankruptcy petition in order to frustrate their pending State Court Action. Since the Association has called the Debtor's good faith into question, the burden is on the Debtor to establish that it filed its bankruptcy petition in good faith.

First and foremost, this is a chapter 7 case so there simply is no reorganizational purpose. To overcome this obstacle, the Debtor argues that a chapter 7 Trustee would be well-suited to recover the insurance proceeds[10] for the benefit of creditors. This argument is wholly unsupported by the record and, in reality, may be nothing more than wishful thinking.[11] The court finds that the hope that a chapter 7 Trustee may be in a better position than the Debtor to

---

[10] This assumes that the insurance proceeds are in fact property of the estate. The court has not determined that issue.

[11] Recovery of insurance proceeds under the Declaratory Judgment Action or any of the Debtor's pending claims with its other insurers is purely speculative and, at best, at its very early stages.

recover on an asset does not constitute a valid reorganization purpose. There simply would be no reorganization here, rather just a liquidation of assets and a distribution scheme that would likely harm the Association. Any insurance proceeds recovered by a chapter 7 Trustee (assuming there would be distribution to the estate) would be set off by the necessary costs of administering the estate, such as trustee fees and commissions,[12] and payments to other priority creditors thereby reducing payments to unsecured creditors. Indeed, any recovery to the Association would occur only after priority claims were paid and even then, the Association would have to share *pro rata* with all remaining unsecured creditors (which may include deficiency claims of the secured creditors). In addition, it was acknowledged that the Motion to Extend is extraordinary relief granted in the most unusual of circumstances. In other words, this is not ordinary relief usually afforded in a bankruptcy case and it is certainly not consistent with a valid reorganizational purpose, especially in a chapter 7 case. Consequently, the Debtor has not overcome its burden to show that the Petition was filed in good faith.

To confirm the court's determination that the Petition was not filed in good faith, the court is further persuaded by the fact that Member Lublin, a co-Manager of the Debtor, testified that the Debtor filed for bankruptcy solely to benefit from the protection of the automatic stay since the Debtor wished to conclude the Declaratory Judgment Action and determine its potential insurance claim before the State Court Action moved forward. Member Lublin also stated that he was aware at the time the Debtor filed for bankruptcy of the significance of the Debtor's Motion to Enforce in that if the motion were successful he and the other Members would benefit personally from the imposition of the automatic stay. Even counsel admitted that the bankruptcy was filed in order to obtain a stay to pursue the Declaratory Judgment Action and determine the availability of insurance coverage before the State Court Action proceeded. Thus, it is apparent that the Debtor's bankruptcy case was filed purely as a litigation tactic. The remaining question is whether the tactic is an abuse the provisions, purpose, or spirit of bankruptcy law. The court believes it does.

In addition to elucidating the Debtor's strategy of filing for bankruptcy in order to engage the protection of the automatic stay, Member Lublin's testimony also highlighted the careless disregard with which he and the other Members approached the bankruptcy filing. For example, Member Lublin testified repeatedly that he relies heavily on professionals, such as his attorneys and accountants, to advise him, to the point that he does not even read the documents they present him. In particular, he stated that the Debtor's attorneys made the decision to file the bankruptcy petition and that he and suggested that the other Members did not even have the draft petition or schedules available to them to review before they voted to authorize the filing. Member Lublin also made it abundantly clear that he paid almost no heed to the contents of the bankruptcy petition or the other documents filed in conjunction with the Debtor's bankruptcy since he relied on his advisors and their competence to ensure the accuracy of all the documents filed on the Debtor's behalf. Finally, Member Lublin acknowledged that he has not seen a report from the insurance expert on whom he and his attorneys rely for their entire theory that the Declaratory Judgment Action will net insurance assets for the bankruptcy estate and the

---

[12] While Member Lublin stated he would pay for the Trustee to pursue the insurance proceeds in state court, the Trustee will still incur fees and costs and commissions to be paid by the estate. Indeed, the Trustee has filed an application to retain the Debtor's attorney's firm as counsel. Based upon the pleadings submitted, the parties disagree has to whom the insurance proceeds would belong to which will likely result in litigation between the Trustee and the Association.

bankruptcy case is thus necessary in order to obtain the stay and pursue the Declaratory Judgment Action to its conclusion. In sum, Member Lublin's testimony made clear that the Debtor's sole purpose in filing for bankruptcy was to benefit from the protection of the automatic stay so that he and Member Walsh, who were funding both the State Court Action and the Declaratory Judgment Action, would only have to fund one case at a time and would know the availability of the insurance proceeds before they had to move on and defend the State Court Action. This is not a valid purpose for the use of bankruptcy law.

More generally, Member Lublin's testimony highlighted the Debtor's disregard for the bankruptcy process. Member Lublin and the Debtor's other Members appear to have put minimal thought into their decision to put the Debtor into bankruptcy, instead relying exclusively on the advice of counsel. Member Lublin made clear at several points that he did not review or could not recall if he had reviewed the key documents that form the bankruptcy petition. As stated above, Member Lublin suggested that he and Member Walsh did not have the bankruptcy petition and schedules in front of them when they voted in favor of the bankruptcy filing. This court assumes that Member Bada and Member Ciminera were similarly bereft of the key documents upon which they could have made an informed decision to authorize the Debtor's bankruptcy.

In addition, the glaring inaccuracies contained in the schedules filed with this court lead the court to conclude that there is an abuse of the provisions, purpose and spirit of the bankruptcy laws. For example, Member Walsh certified on more than one occasion the extent of the membership interests. Interestingly, to date, there still is no amendment to the Petition to reflect what the Debtor believes is the true percentage of the Members' interest in the Debtor, i.e., 25% for each Member. Perhaps most incredible is the omission of the insurance policies in the original Petition, an asset which the Debtor argues is the only asset of value and the prospective recovery upon which the Debtor bases its entire case. This reaffirms this court's belief that the Debtor did not take this bankruptcy case seriously and the sole purpose of it was to a litigation tactic to delay the State Court Action.

It is noted that counsel to the Debtor has fallen on the sword and stated it was his error with regard to the calculation of the membership interest however, the fact remains, Member Walsh, as Manager and person signing the Petition, made no effort to correct the inaccuracy - twice. By signing his name under penalty of perjury, Member Walsh certified that the information contained in those documents was true and correct but such is evidently not the case. Although those errors may have been transmitted to the court by way of the Debtor's attorneys, they are ultimately the Debtor's responsibility. While in some circumstances, the Third Circuit has stated that "the advice of counsel may provide an excuse for an inaccurate or false oath," *In re Georges*, 138 Fed. Appx. 471, 472 (3d Cir. 2005) (citing *In re Topper*, 229 F.2d 691, 692 (3d Cir. 1956)), such excuse is only viable when the "advice of counsel was needed by such debtors in order for them to be able to ascertain what they needed to do, that is whether they needed to disclose and, if so, in what fashion." *In re Dolata*, 306 B.R. 97, 150 (W.D. Pa. 2004) (citations omitted). "[I]t is well settled that reliance upon advice of counsel is . . . no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules." *In re Dawley*, 312 B.R. 765, 787 (Bankr. E.D. Pa. 2004) (citing *In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the

sand, disclaim all responsibility for statements which he has made under oath." *Id.* (citing *Tully*, 818 F.2d at 111). "Debtors have an ultimate responsibility for the accuracy of their schedules which cannot be avoided by playing ostrich," for example, by failing to read or review documents. *Id.* (citing *Rafool v. Wilson (In re Wilson)*, 290 B.R. 333, 340 (Bankr. C.D. Ill. 2002)). Thus, in general, debtors are responsible for errors in their pleadings. *See In re Gonzalez*, 248 B.R. 731 (Bankr. S.D.N.Y. 2000) ("In this instance, while the failure to correct the error may have been her prior attorney's fault, it is ultimately the debtor's responsibility."); *In re Hansen*, 325 B.R. 746, 760 n.10 (Bankr. N.D. Ill. 2005) ("That Hansen acted on legal advice—if indeed he did—also is not a valid excuse for the many falsehoods in his schedules and SOFA. Hansen signed the schedules and SOFA, attesting to the truth of their contents. He is responsible for their inaccuracy, not his lawyer.") (citing *Lewis v. Summers (In re Summers)*, 320 B.R. 630, 642 (Bankr. E.D. Mich. 2005); *In re Olbur*, 314 B.R. 732, 746-47 (Bankr. N.D. Ill. 2004); *In re Bostrom*, 286 B.R. 352, 363 (Bankr. N.D. Ill. 2002) ("The Debtors cannot rely on the advice of counsel defense regarding errors in the Schedules and Statement of Financial Affairs where the Debtors have declared under penalty of perjury that they have read the documents, and to the best of their knowledge, the documents were true and correct.")).

In this case, the glaring inaccuracies for which Member Walsh signed his name are the type which the Debtor should be held responsible for as they pertain to information within the Debtor's purview and not legal advice. Member Walsh signed his name under penalty of perjury and on separate occasions the information he attested to was found to be inaccurate. The magnitude and frequency of errors in this case suggests that the Debtor did not act thoughtfully in its decision to file its bankruptcy petition and did not display the requisite attention to detail indicative of actions taken in good faith.

Also, this court does not look favorably upon the fact that Member Walsh, the person solely responsible for signing the Petition and various Amendments, did not appear at the December 4 hearing, despite the fact that testimony would be taken. This further suggests that the Debtor and its Members did not take the bankruptcy process seriously. To the extent that Member Walsh's testimony may have portrayed the Debtor in a better light, the court is unable to consider that which is not before it, and the court considers Member Walsh's absence indicative of the negligence and lack of care with which the Debtor approached its bankruptcy filing.

Finally, the court has considered the Association's argument that allowing the Debtor's case to remain in bankruptcy with the stay in place would cause a hardship for them. In particular, the court looks to the facts that: the Association has already spent over four years litigating the State Court Action; the Debtor's potential recovery in the Declaratory Judgment Action is speculative as to the one insurer involved; and the insurance claims with the three other insurers will require time to resolve as evidence that the Association will be substantially prejudiced by allowing this bankruptcy case to proceed. The financial strain on the Members of allowing the State Court Action to proceed is not enough to overcome the prejudice to the Association.

The court has carefully considered the unusual facts before it and determined that the Debtor has not met its burden of proving that the Petition was filed in good faith. While both

Member Ciminera and Member Lublin provided credible testimony at the December 4 hearing, and the court does not believe there was any intentional malice involved in the Debtor's filing, the court nevertheless believes the Debtor's bankruptcy case contains the classic hallmarks of bad faith and cannot be allowed to continue. In particular, this court highlights the fact that the Debtor was using the bankruptcy court solely to delay or otherwise frustrate the State Court Action (which even the Debtor acknowledges will eventually need to be litigated in a state court forum), the timing of the filing,[13] the reckless disregard with which the Debtor's Members treated the bankruptcy process, the carelessness with which the Petition and amendments were prepared and signed, the failure to initially list the alleged greatest asset, the lack of a valid reorganizational purpose, the absence of Member Walsh at the December 4 hearing and the prejudice to the Association as evidence of bad faith. Furthermore, the court considers the Debtor's brazen attempt to file a bankruptcy case in order elicit the extraordinary relief of protection of its non-bankrupt Members from litigation indicative of bad faith.

In light of these facts, the court finds that the Debtor abused the provisions, purpose and spirit of bankruptcy law in filing its bankruptcy petition. As such, the court has no choice but to dismiss the Debtor's bankruptcy petition for cause under Section 707(a) of the Bankruptcy Code.

In light of its decision to dismiss the Debtor's case for bad faith, the court need not address the Association's motion for relief from stay to pursue the State Court Action.

### C. Motion to Extend

In light of its decision to dismiss the Debtor's case for bad faith, the court need not address the Debtor's Motion to Enforce (which sought to extend the stay to the Debtor's Members) as it is moot.

### IV.    Conclusion

Based on the foregoing, the Motion to Dismiss is granted, the Association's request for relief from the stay is denied as moot and the Motion to Extend is denied as moot. Counsel for the Association is directed to submit a form of order consistent with the court's findings.

---

[13] The court finds it suspect that the Debtor retained counsel in June 2014 and waited until one week before motions in the State Court Action to file the Petition. Also troubling is the fact that the Petition was obviously not an emergency petition where mistakes might be expected. Even with the lead time given, the Petition and some amendments contain significant inaccuracies that lead the court to the conclusion that the bankruptcy process was pursued with the requisite good faith and therefore, has been abused.